UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>              Plaintiff,<br><br>      v.<br><br>RASHAWN RUSSELL,<br><br>              Defendant. | Civil Action No. 1:23-cv-2691<br><br>ECF Case<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("Commission") alleges as follows:

## I.    SUMMARY

1.  From at least November 2020 through July 2022 (the "Relevant Period"), Defendant Rashawn Russell ("Russell") engaged in a fraudulent digital asset commodity trading scheme. Russell solicited retail investors to contribute to a purported proprietary digital asset trading fund and accepted contributions in the form of bitcoin, ether, and/or fiat currency. Russell guaranteed no loss to investors, and in some instances, guaranteed a minimum twenty-five percent return. In reality, Russell intentionally and/or recklessly made false and misleading statements to solicit and retain investors. Russell misrepresented the structure, size, and performance of the fund; traded little, if any, of the money and digital asset commodities contributed by investors as he represented he would; falsely promised investors that he would pay their withdrawal requests, including falsely promising to some investors that he would pay their withdrawal requests in the stablecoin USDC; and, misappropriated at least $1 million of customer assets.

2. Russell began soliciting investors for his digital asset trading fund "R3 Crypto Fund" beginning at least as early as November 2020. Russell told prospective investors that he would pool investor contributions and use these contributions to trade digital asset commodities for the benefit of the fund. Russell told prospective investors that their contributions would be locked up in the fund for a three-month term. At the end of the three-month term, Russell would give investors the option either to receive their original investment plus any profits generated by Russell's trading or to roll their contribution plus profits into another three-month fund cycle.

3. Russell represented to investors that they had the option of receiving a flat twenty-five percent (25%) guaranteed return on their contribution at the end of the three-month term, with any profits above this amount going to Russell. Alternatively, Russell told investors they could elect to receive eighty percent (80%) of all profits, with twenty percent (20%) of these total profits going to Russell as a management fee (hereinafter referred to as the "80/20 split"). Under either option, Russell guaranteed the investor's original contribution.

4. Russell received contributions from investors either in fiat currency, via wire transfers to Russell's personal bank accounts or through third-party payment applications, or in bitcoin and ether, via transfers to digital wallets Russell controlled.

5. Throughout the scheme, Russell routinely represented to current and prospective investors that his trading for the fund was highly profitable, at times generating returns as high as fifty percent (50%) or more. These representations led many new investors to contribute to the fund and existing investors to choose to roll over their original investment and their purported profits into the next fund cycle. In some instances, Russell's representations regarding his trading performance led existing investors to make additional contributions to the next fund cycle, thus increasing the amount of their total contribution.

6. When investors sought to withdraw their contributions and purported profits, however, Russell made further misrepresentations to avoid making any payments to investors. Russell made a multitude of excuses to such investors, including misrepresentations that he was in the process of wiring money to them or that he would pay their contributions plus profits in the form of USDC to a digital wallet. Russell delayed his responses to repeated requests from investors and eventually stopped responding at all.

7. With limited exceptions, Russell's investors failed to recover any of their investment. In total, during the Relevant Period, Russell received more than $1 million in fiat currency, bitcoin, and ether contributions to the fund. Rather than utilize these assets for digital asset trading as represented, Russell withdrew significant amounts of investor funds in cash from his bank, made Ponzi-like payments to current investors with new investor funds, paid for personal expenses, including food and ride-share costs, and paid or deposited the funds with gambling websites and/or establishments. In total, Russell misappropriated for his own benefit at least $1 million from at least a dozen investors.

8. By virtue of this conduct, as further alleged herein, Russell engaged in acts and practices that violated provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.*, and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* (2022). Specifically, Russell engaged in acts or practices in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1 (2022).

9. Unless restrained and enjoined by this Court, Russell is likely to continue engaging in the acts and practices alleged in this Complaint.

10. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to permanently enjoin Russell's unlawful acts and practices and to compel his

compliance with the Act and Regulations, and to further enjoin Russell from engaging in any commodity-related trading activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, restitution, disgorgement, trading and registration bans, pre- and post-judgment interest, and such other relief as this Court deems necessary and appropriate.

## II. JURISDITION AND VENUE

11. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

12. Certain digital assets, including bitcoin, ether and USDC, are "commodities" in interstate commerce.

13. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Russell transacted business in this District and certain of the acts and practices in violation of the Act have occurred within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because Russell resides in this District and a substantial part of the events giving rise to this action occurred in this District.

### III.   PARTIES

14. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.  The Commission is headquartered at 1155 21st Street, NW, Washington, DC 20581.

15. Defendant **Rashawn Russell** is a resident of Brooklyn, New York.  Russell has never been registered with the Commission in any capacity.  Russell was previously registered with the Financial Industry Regulatory Authority, Inc. ("FINRA") as a broker from August 20, 2018 through December 13, 2021, during his prior employment at a large financial institution.

### IV.   FACTS

**A.   Russell Solicited Individuals to Contribute to a Purported Investment Fund that Russell Claimed Would Trade Digital Asset Commodities.**

16. Beginning at least as early as November 2020, Russell began soliciting investors to contribute to his digital asset trading fund, the "R3 Crypto Fund."

17. At that time, Russell was an investment banking associate at a large financial institution.  Russell had graduated from Babson College a few years earlier and was a Gates Millennium Leadership Scholarship recipient.

18. Russell, who was about twenty-five years old at the time, utilized his educational background, work experience, and purported trading successes to convince several colleagues, college friends, and family members of friends to contribute to his fund.

19. Russell told prospective investors that he would use fund assets to trade various digital asset commodities, in particular exchanging bitcoin for so-called "altcoins," touting his ability to use technical analysis and his trading experience to predict when the prices of such "altcoins" would be likely to fall or rise relative to bitcoin.

20. For example, in or around November 2020, Russell represented to at least one prospective investor: "I've been actively trading crypto/altcoins for a while now and over the past few months I've been fine-tuning and implementing different trading strategies that have proved to be extremely successful. . . . I've grown my investments from a little under 90k to 270k. I've decided to start raising equity from family/friends (have raised ~38k so far). I'm starting pretty small and goal is to raise 50k. Taking investments from 5k+ and I'm guaranteeing a ROI of 25% on your investment within 3 months . . ."

21. Russell further represented to this investor that there was "essentially no downside risk at all for my 1st raise really since no matter what you're getting 25% ROI." Russell told this investor that Russell was personally responsible for the investor's entire contribution.

22. Russell later represented to the same investor in connection with soliciting additional contributions that Russell had never had a loss of more than five percent (5%), that he always traded with a stop loss to limit risk, and that on an average day he made between six and eight percent (6%-8%) gains.

23. By January 2021, Russell had successfully solicited a number of investors to contribute to the fund bitcoin, valued at approximately $65,000 at the time investors sent it to Russell's digital wallet, and fiat currency of approximately $100,000, which investors transferred to Russell's personal bank account.

**B.     Between November 2020 and July 2022, Russell Obtained Contributions from at Least Twelve Individuals and Signed Written Investment Agreements with Many of Them.**

24. After successfully attracting several investors for his fund, Russell formalized his solicitation tactics in the Spring of 2021, creating written marketing materials and developing a written investor agreement.

25. Beginning by at least May 2021, Russell began entering into written investor agreements with his investors.

26. The written investor agreements set forth the amount of the investor's contribution to the fund and indicated that such contribution was a "Capital Investment for [Russell] to use as part of [his] dry powder for [Russell's] actively traded cryptocurrency [fund]."

27. For those electing to invest under the 80/20 split option, the written agreement further provided that, "[Russell] guarantees that no less than the Client Capital Investment will be returned regardless of [fund] performance." Alternatively, for those investors that elected the guaranteed twenty-five percent return, the written agreement provided, "Russell agrees to return the Client's original investment plus the 25% return for a total of [investment plus 25%]."

28. By at least August 2021, Russell had also prepared a written overview of the R3 Crypto Fund, which he provided to some, if not all, of the fund's investors and potential investors in connection with his solicitations of initial or additional investment in the fund.

29. In the overview document, Russell described the R3 Crypto Fund, in part, as follows:

> R3 is essentially an actively managed cryptocurrency fund that focuses primarily on altcoins and take [sic] on a unique trading strategy that implements both fundamental and technical analysis to deliver proven returns for investors.
>
> \*   \*   \*
>
> All R3 funds have a short investment time horizon of 3 months. Investors will receive back their initial investment within 3 months along with their return on their investment.
>
> \*   \*   \*
>
> There are two options a potential Investor could choose from:

7

      1.  A guaranteed flat 25% return on investment within three months with no downside risk. However [sic] will not be able to capitalize on any of the additional upside beyond 25%.

      2.  A management based fee structure. Investors will get 80% of all the Funds return less a 20% management fee for services rendered. Investor is guaranteed to receive no less than their initial capital and is protected on the downside.

30.    In various charts that Russell included in the overview document to illustrate his technical analysis of "altcoins," Russell indicated that he would be purchasing and selling such altcoins in exchange for bitcoin.

31.    In the overview document, Russell claimed that he had been "actively trading in the cryptocurrency space since 2014" and that he had raised "$250,000 for the first fund back in November 2020."

32.    By early 2022, Russell had updated the overview document to include purported historical fund size and performance. Russell distributed this updated overview to prospective investors, at least some of whom invested in the fund after receiving this document.

33.    Specifically, the updated overview contained the following representations of prior performance:

    How have past R3 Crypto funds performed?

      – R3 Crypto Fund I (size $250K) – ~118% return

      – R3 Crypto Fund II (size $500K) – ~147% return

      – R3 Crypto Fund III (size $850K) – ~34% return

34.    In total, beginning as early as November 2020 and ending as recently as July 11, 2022, Russell successfully solicited at least a dozen individuals to invest in at least one or more of eight purported three-month investment cycles (R3 Fund – R3 Fund VII).

8

    **C.**    **Russell Misrepresented the Fund's Structure, Size, and Performance to Solicit and Retain Investors and Instead Misappropriated Investor Contributions.**

        **1.**    **Russell Misrepresented the Structure of the Fund to Investors and Prospective Investors to Create the Appearance that He Was Managing a Legitimate Investment Fund.**

35.    Russell represented to prospective and current investors that he structured the fund to have specific investment cycles with beginning and end dates. Russell represented that the fund operated on a three-month investment cycle and that that he could not accept new contributions after the start date of a particular three-month cycle. Russell further represented that at the end date of the three-month cycle, investors had the option to receive their original contribution plus profits or to roll this amount into the next three-month cycle. Russell made these representations in his written fund overview, written investor agreements, and in his one-on-one communications with investors and prospective investors.

36.    For example, Russell made statements to investors and prospective investors such as:

    a.  "If you can let me know by sometime next week that would be great looking to close new fund by next Friday." (April 30, 2021)

    b.  "Going to close the fund Aug 6th and then start sending across payouts to investors then." (July 20, 2021)

    c.  "I pushed the kickoff of the new fund to [November] 29th. I haven't sent a new agreement because I was still waiting for you to get back with what your uncle plans on doing." (Nov. 20, 2021)

    d.  "Hey man so normally the next round kickstart [sic] right after the other. I always leave 2 weeks in between ending and starting a new round. So this case new

9

round starts 2/14 and have [sic] the same three months investment horizon."

(February 1, 2022)

37. The written investor agreements also set forth the specific start and end dates for the particular three-month investment cycle in which the investor was participating. Each agreement further referenced a fund number, for example, "R3 Fund II" or "R3 Fund V," which created for investors and prospective investors the appearance that Russell structured the fund and his trading strategy and activity around these specific three-month investment cycles.

38. Russell's representations to investors and prospective investors regarding these three-month investment cycles were false. Russell made these false representations intentionally or recklessly to give the false appearance of structure and authenticity to his scheme.

39. For example, at least three different investors entered into written investor agreements with Russell that stated that these investors would be participating in "R3 Fund V." However, each of the three agreements set forth a different start date for the "R3 Fund V" three-month investment cycle, specifically, October 1, 2022, November 1, 2022, and November 22, 2022. Each of these three agreements also set forth a different end date for the "R3 Fund V" three-month investment cycle, specifically, January 1, 2022, February 1, 2022, and February 22, 2022, respectively.

40. In addition, Russell gave different investors different dates for the start and end of other purported three-month investment cycles which overlapped by days, months, or, in one instance, entirely. For example, Russell provided one investor with an investor agreement that stated that R3 Fund III's three-month investment cycle would begin August 20, 2021 and end November 20, 2021, and provided a different investor with an investor agreement that specified those same dates as the start and end dates of the three-month investment cycle for R3 Fund IV.

10

### 2. Russell Misrepresented Fund Assets and Performance to Solicit and Retain Investors and Misappropriated Assets Contributed by Investors.

41. Russell also routinely sent current and prospective investors information that falsely represented the size and performance of Russell's purported fund.

42. For example, on February 5, 2021, Russell falsely represented to one investor that Russell had sent $375,000 of fund assets to Russell's bank account, following the purported conclusion of a three-month investment cycle for which Russell claimed he had raised $300,000. In support of this, on February 8, 2021, Russell sent the investor a screen shot of his bank account balances, to "calm the nerves" of this investor. This screen shot purported to show that Russell had a total of over $400,000 in two different bank accounts. In reality, at that time, Russell had less than $60,000 in both of these accounts, $50,000 of which consisted of money he had just received from this same investor.

43. On May 8, 2021, Russell provided a prospective investor with purported historical information for the fund, representing that between February 2, 2021 and April 15, 2021, the fund generated a +147.49% cumulative profit and loss ("P&L"), with an estimated balance of 15.547196615 bitcoin (equivalent to $922,331.06).

44. On or about May 11, 2021, Russell provided this same prospective investor with a purported screen shot of Russell's current bank balances, purporting to show that Russell had more than $1.4 million in two separate bank accounts. Specifically, the screenshot purported to show that the account, to which Russell was simultaneously directing the investor to send money to invest in the fund, had a balance of $1,310,300. In reality, this account had a balance of no more than $25,000 at any point during the entire month of May 2021.

45. Within days of receiving this information, this investor and two other members of the investor's family entered into written investor agreements and invested a total of $110,000 in Fund II.

46. Russell represented to investors that the starting value of Fund II, which purportedly began on May 18, 2021, was $910,000. On June 6, 2021, less than three weeks later, Russell represented to investors that the balance of the fund was an estimated 34.166041342 bitcoin, the equivalent of $1,226,578.62, with a cumulative P&L of +34.79%. A month later, on July 5, 2021, Russell claimed the fund was up 46%. And, on August 9, 2021, after representing that he had closed Fund II three days earlier, he represented to one or more investors that the fund ended up approximately 34%, which after the 20% management fee, put total return to investors at approximately 27%.

47. Russell's representations of Fund II performance and size resulted in at least three investors in Fund II deciding to roll-over their investment and enter into new investor agreements with Russell for purported Fund III.

48. Russell continued to misrepresent fund size and performance to current and prospective investors with respect to subsequent three-month investment cycles for the fund. Russell's misrepresentations included that:

   a. Fund III began trading August 23, 2021, and approximately a month later, on September 25, 2021, had a balance of 33.406927088 bitcoin, equivalent to $1,419,491.39, with a cumulative P&L of +13.56%;

   b. On October 17, 2021, Fund III was performing "pretty well," with Russell providing an investor a screen shot of the Fund III's purported performance showing an

estimated bitcoin balance of 29.252949001, equivalent to $1,783,018.32, and a cumulative P&L for the period of August 23, 2021 to October 17, 2021 of +42.64%;

c. Fund III's three-month investment cycle concluded in November 2021 with the fund earning cumulative P&L of +56%; and

d. On January 22, 2022, the fund had a total estimated balance of 57.068185084 bitcoin, equivalent to $2,212,615.93, with cumulative P&L since November 29, 2021, of -1.66%. Russell provided this information to an investor while touting the fact that the overall crypto market was down more than 40% during recent months, but the fund was only down a few percent in comparison.

49. Russell made these misrepresentations intentionally or recklessly to convince investors and prospective investors to contribute assets to the fund or to remain invested in the fund for subsequent three-month investment cycles.

50. Contrary to Russell's representations regarding fund size and performance, Russell used significant amounts, if not all, of the investors' contributions to the fund for various purposes completely unrelated to digital asset commodities trading.

51. For example, in less than two weeks following his receipt in his personal bank account of an investor's contribution of $230,000 on November 19, 2021, Russell withdrew more than $115,000 in cash and wired more than $77,000 to investors in the manner of a Ponzi scheme. Russell even wired $50,000 from this bank account back to the same investor who had contributed the $230,000, but represented this wire as a "withdrawal" of funds this investor had contributed prior to November 19, 2021. Russell also used part of the $230,000 contributed by this investor to fund a transfer of several thousand dollars to an entity associated with gambling activities as well as to pay personal expenses such as loans, food, and ride-share charges.

52. Similarly, on November 29, 2021, Russell received $200,000 in investor contributions in his personal bank account. Russell then withdrew approximately $68,000 in cash, transferred approximately $70,000 to entities associated with gambling activities, wired $50,000 to another investor in the manner of a Ponzi scheme, and paid for food, travel, and other personal expenses.

53. During the Relevant Period, Russell misappropriated at least $1 million in investor assets in the form of fiat currency, bitcoin, and/or ether.

### D. Russell Made Further Misrepresentations to Investors to Conceal His Fraudulent Scheme

54. When investors attempted to withdraw their assets from the fund at the end of a three-month investment cycle, Russell routinely engaged a pattern of evasive and misleading behavior. Russell delayed in responding to investor withdrawal requests, provided a variety of excuses to investors, including misrepresenting that payment was forthcoming, and then ultimately ceased responding to their requests.

55. Russell made numerous false excuses to investors for why he could not immediately honor their withdrawal requests, including:

    a. He lost his phone and all contact information;

    b. He was too busy trading and had not yet had time to initiate the transfer of funds;

    c. He was consulting with an accountant regarding the exposure to and mitigation against realization of large capital gains for himself and/or the investor as a result of the funds significant profits;

    d. He was out of town, including that he was on vacation in Hawaii in December 2021, or travelling for work in January and February 2022;

      e. His bank had daily wire limits from his account limiting and extending the time it took for him to send out funds to his many investors;

      f. His bank had flagged his account, due to the number and large amount of wires he was sending to and receiving from investors, and he was temporarily unable to access the funds until the bank's investigation was completed; and,

      g. He had created a new bank account at a different bank due to these issues and it was taking time for the funds to reach his new account, and then later, that he needed an active debit card so that he could wire funds from this new account.

56. Russell also sent investors screen shots purportedly representing wire transfers that were in process, or in some cases, that were purportedly successfully sent to the investors as payouts on their investment. However, the majority of these payouts were never received. In some cases, Russell sent these screen shots knowing or with reason to know that he did not have sufficient funds in his bank account to fund the wire transfer.

57. For example, on July 5, 2022, Russell sent an investor who had requested to withdraw assets from the fund a screen shot depicting a purported pending wire transfer request to transfer $75,000 to the investor's bank account. The screen shot also purported to show $77,277.45 in available funds in Russell's bank account. In reality, on that date, this same account had a negative balance of $162.46. The wire was never received by the investor.

58. By mid-2022, many investors were seeking to withdraw their assets from the fund. On June 17, 2022, Russell sent an e-mail to investors purportedly detailing how and when he would honor withdrawal requests. In the e-mail, Russell falsely represented that he would make payments to investors in USDC and that he would begin making these payments at the end

of July 2022. However, Russell never made these payments, and these investors lost all of the assets they contributed to the fund.

## V. VIOLATION OF THE ACT AND REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1 (2022)**

59. The allegations set forth in Paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

60. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), renders it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

61. Regulation 180.1(a), 17 C.F.R. § 180.1 (2022), provides, in part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make or attempt to make, any untrue or misleading statement of material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; . . . .

62. Certain digital assets, such as bitcoin, ether, and USDC, are encompassed in the definition of a "commodity" under Section 1a(9) of the Act, 7 U.S.C. §1a(9), and contracts for

their sale are subject to the prohibitions of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1 (2022).

63. As described above, Russell violated Section 6(c)(1) of the Act and Regulation 180.1, in connection with contracts of sale of commodities in interstate commerce, by, among other things, intentionally and/or recklessly falsely guaranteeing no loss of investment; misrepresenting that investor funds would be utilized to trade digital asset commodities; misrepresenting fund structure, size, and performance, including providing false bank account balances that misrepresented available funds; misrepresenting that payouts to investors were forthcoming, including sending copies of purported wire transfer requests, when Russell knew or should have known, such requests would not clear his bank account; and misappropriating investor assets.

64. Russell's misrepresentations and omissions were material. Investors made decisions on whether to invest, how much to invest, and whether to stay invested in the fund based on Russell's misrepresentations regarding fund structure, size and performance, as well as Russell's promise that their original investment was not at risk of loss. Russell failed to inform investors that he was utilizing their funds for his personal benefit.

65. Russell engaged in the acts and practices described above knowingly or recklessly.

66. Each act of misappropriation, misrepresentation or omission of material fact, falsified bank record or fund statement, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1 (2022).

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

a.) Find that Russell violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1 (2022);

b.) Enter an order of permanent injunction enjoining Russell and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1 (2022);

c.) Enter an order of permanent injunction restraining and enjoining Russell and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1.) Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2.) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3) or digital assets that are commodities, as that term is described herein, for his own personal account or for any accounts in which Russell has a direct or personal interest;

3.) Having any commodity interests or digital assets that are commodities, as that term is described herein, traded on Russell's behalf;

    4.) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities, as that term is described herein;

    5.) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital assets that are commodities, as that term is described herein;

    6.) Applying for registration or claiming any exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

    7.) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent or any other officer or employee of any person registered, exempted from registration, or required to the registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

d.) Enter an order directing Russell, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived from, directly or indirectly, the acts or practices which constitute violations of the Act and Regulations as described herein, and pre- and post-judgment interest;

19

e.) Enter an order directing Russell, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every person who has sustained losses proximately caused by the violations of the Act and Regulations, as described herein, including pre- and post-judgment interest;

f.) Enter an order directing Russell to pay civil monetary penalties assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8, for each violation of the Act and Regulations, as described herein;

g.) Enter an order requiring Russell to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

h.) Enter an order for such other and further relief as the Court may deem necessary and appropriate under the circumstances.

Dated:  April 11, 2023

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

By: */s/Rebecca J. Jelinek*
Thomas L. Simek (DC Bar #490030)
Rebecca S. Jelinek (MO Bar #53586)
2600 Grand Blvd., Ste. 210
Kansas City, Missouri 64108
Telephone:  (816) 960-7700
Facsimile:  (816) 960-7750
E-mail: tsimek@cftc.gov
           rjelinek@cftc.gov

Attorneys for Plaintiff